**UNITED STEELWORKERS OF AMERICA, AFL–CIO, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**The Dow Chemical Company, Intervenor.**

**No. 75–1737.**

United States Court of Appeals, Third Circuit.

Argued April 5, 1976.

Decided May 18, 1976.

Carl B. Frankel, William H. Schmelling, Pittsburgh, Pa., Bernard Kleiman, Chicago, Ill., Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., for petitioner.

Peter M. Bernstein, John S. Irving, Jr., Elliott Moore, Washington, D. C., for respondent.

Kenneth C. McGuiness, Robert E. Williams, Washington, D. C., Thomas W. Misner, Midland, Mich., for intervenor.

Before GIBBONS, BIGGS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Section 9(a) of the National Labor Relations Act, as amended ("the Act"), 29 U.S.C. § 159(a),[1] requires that a collective bargaining representative be given the opportunity to be present on any occasion when employee grievances are adjusted by the employer. This right, like others in the labor relations field,[2] may be relinquished by the employee representative in the give and take of collective bargaining, or at any time when the representative believes that such action

---

1. 29 U.S.C. § 159:

    (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment.

2. *E. e.,* the right to strike for economic benefits, *Mastro Plastics v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); the right of access to relevant wage information, *Timken Roller Bearing Co. v. NLRB,* 325 F.2d 746 (6th Cir. 1963), *cert. denied,* 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964).

would be in the best interest of the employees.[3] In the present case, the union *did* execute a limited "waiver" of its rights under § 9(a), and the employer *did* take action, without the presence of union representatives, which is alleged to have constituted the adjustment of grievances. The question which must be decided is whether the employer's program can be found to be within the scope of the waiver's authorization.[4]

### I.

For at least twenty years, Local 12075, United Steelworkers of America, AFL–CIO ("the Union"), and its predecessor have served as the duly designated and recognized collective bargaining representative of certain employees at the Midland Division (Michigan) plants of Dow Chemical Company. The relevant collective bargaining agreement was effective from March 8, 1971 to March 11, 1974.

In December, 1972 the employer instituted a program soliciting communications in the nature of questions, suggestions and complaints from employees. This program, known as "Speak Out," was begun without prior notice to, or consultation with, the Union. "Speak Out," was announced by means of a booklet mailed to each employee, which set forth the procedures to be followed and the philosophy and goals of the program:

It opens up a way for any of us to speak his mind, and get an answer, when some-

thing's nagging at us but—for some reason—we'd rather not take it the more usual route.

I'm convinced that 'Speak Out' will be a valuable addition to our employee communications.[5]

Submissions under "Speak Out" were to be made on standard forms and directed to the coordinator of "Speak Out." The communicating employee had the option of providing his or her name or preserving complete anonymity. Upon receiving a communication, the "Speak Out" coordinator might either deal with it personally or refer it to any other person(s) in management having expertise or authority in the subject matter area. In the latter case, the submitting employee's name, if shown, would be removed before transmittal. After the "Speak Out" coordinator or other designated company officer(s) had time to gather information, a reply would be composed. However, as the introductory booklet itself made clear, all replies were to be reviewed by the General Manager of the Midland Division; only after that would a reply be sent out to any employee who had signed his "Speak Out" request. In addition, selected responses deemed to be of general interest to employees were published in *Brinewell,* a monthly employee magazine edited and published by the company, unless the submitting employee requested that the reply *not* be published.[6]

Without attempting to categorize the responses to all of the two hundred and

---

**3.** In *Hughes Tool Co. v. NLRB,* 147 F.2d 69 (5th Cir. 1945), the court dealt with a prior version of § 9(a) which did not expressly guarantee the Union's right to be present at the adjustment of grievances. Nevertheless, the court found that such a right existed, and stated that it could be waived. The court included provision for such waiver in its proposed modification of the Board's order. In *Bethlehem Steel Co.,* 89 NLRB 341 (1950), *enforcement denied on other grounds sub nom. Bethlehem Steel Co. v. NLRB,* 191 F.2d 340 (D.C.Cir. 1951), the Board held that the employer could not insist upon such a waiver as a condition to a collective bargaining agreement, finding the *Hughes Tool* "dictum" distinguishable on the ground that the latter case involved a *voluntary* waiver.

All parties here agree that the Union's right to be present at the adjustment of grievances may be waived, and in view of our disposition of this petition we have no occasion to question *Hughes Tool.*

**4.** The employer, Dow Chemical Company, contended before the Administrative Law Judge that the charge which instituted this proceeding was not timely filed. This question was resolved against the employer, see opinion at Appendix, p. 871, and has not been raised in this court.

**5.** Appendix, p. 84. The entire brochure is set out at pp. 83a–90a.

**6.** In the case of an anonymous "Speak Out" submission, publication in *Brinewell* would be

eighty-four "Speak Out" submissions received between December, 1972 and November, 1973 from members of the collective bargaining unit, we can note that some merely restated and defended company policies, others merely informed that the matter had been referred to specific officers for further investigation, others suggested that the matter be brought to the Union's attention as a possible topic for future collective bargaining, and still others reflected the

granting of some relief from the company action or condition complained of.[7]

### II.

In June, 1973 the Union filed an unfair labor practice charge with the NLRB. The gravamen of the charge was that Dow Chemical, through the "Speak Out" program, had engaged in the adjustment of grievances without permitting the Union the opportunity to be present, in violation of §§ 8(d),[8] 9(a),[9] 8(a)(1) and 8(a)(5)[10] of the

---

the only way in which a response could be communicated to the employee.

7. The 284 "Speak Out" submissions and responses (some incomplete) are set forth in the Appendix at pp. 270a–858a. Petitioner has set forth in its brief (pp. 21–29) some examples which it contends involve the "application of wages, hours and working conditions to individual employees." In some of these examples "adjustments" do appear to have been made, as the Administrative Law Judge recognized.

8. § 8(d), 29 U.S.C. § 158(d):

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and

simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2)–(4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158 to 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer.

9. See n. 1, supra.

10. §§ 8(a)(1), 8(a)(5), 29 U.S.C. §§ 158(a)(1), 158(a)(5):

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees, subject

NLRA.[11] A complaint issued, and thereafter the parties waived hearing and submitted the matter upon stipulated facts and exhibits.

The Administrative Law Judge elected to assume for the purposes of his decision that some of the matters raised in "Speak Out" submissions *were* grievances, within the meaning of the Act.[12] With that assumption, he proceeded to find the remaining elements necessary to bring the employer's conduct into conflict with § 9(a), including the "adjustment" of some of the matters raised through "Speak Out." However, the Administrative Law Judge declined to find an unfair labor practice, on the ground that the Union had waived its rights under § 9(a) and related sections of the Act. The finding of waiver was based on the following provision of the then-current collective bargaining agreement:

Article III, Section 3—Grievance Procedure:

A. It is the intent of this Section, to establish means for prompt adjustment of grievances at the job level with the immediate supervisor and the employee. Therefore, in order to promote better cooperation, understanding, and labor relations between employees, Union Representatives, and the Company, it is agreed that an employee with a complaint or request, must first state his complaint or request to his immediate supervisor, and will give that supervisor a reasonable opportunity to adjust the problem before resorting to grievance procedure. The employee may have a steward present at this meeting, but the employee must state his own complaint.

B. If the complaint is not satisfactorily adjusted by the provisions of Paragraph A, then the grievance procedure outlined below shall be followed. . . .

(Appendix, p. 45a).

There follows a description of a multi-step grievance mechanism (ending with possible arbitration), with each successive step involving progressively higher levels of company management. The Administrative Law Judge's crucial determination was that, assuming that grievances *had* been adjusted in the "Speak Out" program, this involved no variance "of any material significance" (Opinion, p. 875a) from the procedure which the Union had authorized in Section 3A of the collective bargaining agreement.

In December, 1974, a panel of the NLRB adopted without opinion the recommended order of the Administrative Law Judge, and ordered the complaint dismissed (215 NLRB No. 139). One member dissented, taking the position that there were indeed "material difference[s]" (dissenting opinion, p. 886a) between the "Speak Out" procedure and the procedure envisioned by the collective bargaining agreement, and that as a result the former could not be found to be authorized by union consent. From the order of the Board majority the Union petitions this court for review. Dow Chemical Company has intervened.[13]

---

to the provisions of section 159(a) of this title.

**11.** The theory relating the several statutory provisions, as set forth by the Administrative Law Judge (pp. 871–72a), is as follows. If the Company has solicited and adjusted grievances without permitting the Union to be present in violation of § 9(a), this action and the unilateral establishment of "Speak Out" constituted a modification of the collective bargaining agreement without compliance with the terms of § 8(d). This in turn constitutes a breach of the duty to bargain collectively, which is made an unfair labor practice by § 8(a)(5). A violation of the more general § 8(a)(1) is derived from the § 8(a)(5) violation.

We do not read the Board or the employer as contesting this analysis of the consequences of a finding that the Union's § 9(a) rights have been violated.

**12.** The definition of "grievance" has been considered in a number of cases. See, *e. g., Elgin, J. & E. R. Ry. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) (Railway Labor Act); *Douds v. Local 1250, Retail Wholesale Dept. Store Union of America, CIO,* 173 F.2d 764 (2d Cir. 1949); *Hughes Tool Co. v. NLRB, supra; Toledo Local 15–P Lithographers,* 175 NLRB 1072 (1969).

**13.** The Company filed a brief in this court and participated in oral argument.

## III.

At the outset we are faced with the question of the proper standard of review. As noted, the parties have stipulated the historical facts;[14] in our view the disposition here must depend upon the correctness of the determination that there is no *material* difference between the contractual procedure and the "Speak Out" procedure. While this might be deemed a question of ultimate fact, or a mixed question of law and fact, we recognize that its resolution is entitled to some deference because the subject matter is within the Board's area of special expertise. Nevertheless, we are convinced that the view of the dissenting Board member must prevail.

We start from the principle that a waiver of a statutory right must be clearly and unmistakably established, and that express language will not be read expansively. *Radio Television Technical School, Inc. v. NLRB,* 488 F.2d 457 (3d Cir. 1973); *Texaco, Inc. v. NLRB,* 462 F.2d 812 (3d Cir. 1972). From this viewpoint we have little difficulty in defining the scope of the union's waiver. The Union and the Company evidently agreed that an employee would be required initially to state his grievance to his immediate supervisor in a face-to-face meeting.[15] If the supervisor was able to satisfy the employee, no further action would be necessary; if not, the formal grievance mechanism would then be available. The parties to the collective bargaining agreement could well have believed that a provision such as Section 3A would be useful in minimizing unwarranted resort to the grievance

mechanism by "weeding out" those complaints resulting from simple misunderstanding or oversight, as well as those so trivial that the employee would be unwilling to make an initial statement of his own case to his immediate superior.

The more difficult task is the assessment of the differences between the two programs. In undertaking this task, the Administrative Law Judge focused exclusively on asserted disparities in the degree of involvement of middle and upper management. Certainly there would *seem* to be differences in this regard, since the Section 3A procedure speaks only of resort to the employee's immediate supervisor, while "Speak Out" guarantees that at least one middle-management figure (the "Speak Out" coordinator)[16] and one top-management figure (the General Manager)[17] would see and consider the complaint. The Administrative Law Judge discounted this factor; he stated that, "in practice, 'Speak Out' complaints appear to be referred by the coordinator to the supervision involved." However, this observation is not supported by any reference to the record, and we have been unable to find any evidence that *any* "Speak Out" submission, let alone all of them, was in fact referred to the immediate supervisor.

In this court, the Board makes a similarly unpersuasive attempt to minimize the difference in the higher management input factor. The Board argues that Section 3A also permits the immediate supervisor to consult with his superiors before responding to the employee. Certainly there is nothing

---

**14.** There are, in other words, no disputes as to the weighing of conflicting evidence. However, as will be seen, certain facts which might be deemed relevant were not included in the stipulation.

**15.** The Board and the company dispute the Union's position that Section 3A necessarily contemplates an in-person confrontation, as opposed, presumably, to a written presentation. However, we are unable to attribute any other meaning to the provision that "[t]he employee may have a steward *present* at this *meeting* . . . ." (Emphasis added). At any rate, we do not consider the resolution of this dispute crucial.

**16.** We base the characterization of the coordinator as a middle management figure both on the nature of his "Speak Out" work and on the emphasis given in the introductory brochure to the incumbent's past company experience. (See p. 89a).

**17.** The General Manager "carries full responsibility for the Midland Division," (Brochure at p. 87a), and was the management representative at the final step in the grievance procedure. (p. 46a).

in Section 3A which *expressly* precludes this, but there is also no indication in the record as to the extent, *if any*, to which this consultation actually occurs.

█ We are thus unable to agree that this factor may be disregarded. The Board *has* demonstrated that the two procedures might theoretically operate in the same way in a particular case; however, in the absence of evidence as to how the systems *actually* work, it is at least equally plausible to theorize that immediate supervisors will never pass Section 3A complaints on to higher officials, and that the "Speak Out" coordinator will never rely on a solution offered by the immediate supervisor. Where the employer seeks to rely on a waiver to justify conduct otherwise prohibited by the Act, we believe that he must provide more than a theory of possible congruence between authorized and actual conduct.

There are other differences between the procedures, not dealt with in the Administrative Law Judge's opinion, which we believe require consideration.

One is the question of timing. The contractual resort to the immediate supervisor must take place *before* the grievance procedure begins. The "Speak Out" mechanism would be available to an employee before, during or after institution of a formal grievance; there is no indication that the employer has provided safeguards against parallel adjustments of the same grievance under the contract and under "Speak Out."

This makes it considerably more difficult to argue that "Speak Out" is no more than a substitute for and the equivalent of the pre-grievance "complaint" of Section 3A.[18]

Another distinguishing factor is the degree to which anonymity may be preserved. Whether or not Section 3A contemplates a face-to-face confrontation,[19] the contractual remedy rather clearly contemplates that the complaining employee's identity will be known to the immediate supervisor, and there is no reason to believe that it would be concealed from any other officials whom the supervisor might contact. "Speak Out," on the other hand, automatically conceals the employee's identity from all management personnel except the program co-ordinator, and *permits* the employee to proceed in *complete* anonymity.

We also believe that the publication of selected "Speak Out" inquiries and replies in the company magazine is of significance. Once again, there may be nothing in Section 3A to make it clear that the employer could not similarly report the results of pre-grievance complaints presented to immediate supervisors, but there is nothing in the record to indicate that this had ever been done, and we would not intuitively think such a practice likely.

We believe that the foregoing differences in actual or likely operation between the "Speak Out" system and the pre-grievance provision of Section 3A, when considered together, are sufficiently "material" that a consent to the latter cannot be said to authorize the former.[20] In so holding, we

---

**18.** The stipulated record indicates that some employees invoked the "Speak Out" mechanism *after* failing to obtain satisfaction from a Section 3A presentation. The "case" set forth at Appendix pp. 618–19a seems to be one instance in which the "Speak Out" mechanism was invoked in regard to a dispute pending before a grievance committee.

**19.** See n. 15, *supra.*

**20.** The Administrative Law Judge cited *Westinghouse Electric Corp. v. NLRB*, 325 F.2d 126 (7th Cir. 1963), in recommending that the complaint be dismissed. We do not believe that this case supports the decision of the Board or is contrary to our decision here. First of all we note that *Westinghouse* did not involve any

question of waiver of § 9(a) rights. In addition, we believe that the result there rests firmly on the observation that

> there is no evidence in the record that . . . any change occurred in the processing or handling of grievances—or that any grievance was adjusted without a Union representative being given the opportunity to be present.

325 F.2d at 128.

We have not found any of the other cases cited by the parties particularly useful in deciding the ultimate question.

As we have said in the context of the right to strike,

> Whether a particular collective bargaining agreement includes a waiver of the employ-

would emphasize three potential effects on the Union's role as collective bargaining agent, flowing from the operative differences. First, as noted, the "Speak Out" procedure may increase the likelihood that a particular grievance issue will be considered and decided by middle and upper management before the Union's position is heard, or before the Union even has notice of the dispute. The parties have presented arguments in this court as to whether or not such decisions would be binding precedent in later grievance proceedings and arbitrations as the "common law of the contract." We do not find it necessary to decide that question, since we believe that at the very least the "ex parte" decision would have some practical and psychological effect were management personnel called upon to take a position on the sale issue in a subsequent grievance hearing. The Union can properly complain of being forced to argue that a position of the employer, previously expressed in a "Speak Out" reply and thereby concurred in by the highest officer involved in the grievance procedure, should be disregarded in a grievance hearing.

Secondly, "Speak Out" replies may well take on greater impact, as compared to a response from an immediate supervisor, in determining whether the complaining employee will follow through with a formal grievance and whether other employees will pursue similar claims. Once again, one reason is that the "Speak Out" reply is more likely to rely expressly on the views of someone in upper management; furthermore, it carries the approval of the General Manager of the Division. Where the employer chooses to publish a reply in the

*Brinewell*, the impact will be broadened as well as deepened. Even if a potential grievant understands that an unfavorable reply states only the employer's *position* as to rights and duties under the contract, and that the ultimate determination may be made by an arbitrator or a court, he may still be deterred by the advance knowledge that he is likely to meet opposition at all stages of the grievance process.

Finally, the "Speak Out" system offers flexibilities of time and source of relief which not only are not contemplated by Section 3A, but could further reduce the Union's ability to plan the processing of grievances in an orderly and internally consistent manner. Especially where a particular dispute may affect a number of employees, the Union retains a legitimate interest, limited only by the first proviso of § 9(a) of the Act once the contractual grievance procedure is begun, in following a grievance to a definitive determination without unpredictable diversions of the type possible under "Speak Out."

### IV.

We believe that our conclusion that "Speak Out" was not authorized by Section 3A of the collective bargaining agreement is fully consistent with the Company's initial approach to "Speak Out." The introductory brochure seems to anticipate that the new system would function to transmit information and *state* complaints, but not to resolve them. There is no direct reference in the brochure to Section 3A, any other part of the collective bargaining agreement, the Union, or the formal grievance procedure.[21] Furthermore, the Com-

---

ees' right . . ., and the extent of any such waiver, 'turns upon the proper interpretation of the contract . . . [which] must be read as a whole in the light of the law relating to it when made'. *Mastro Plastics Corp. v. NLRB*, [350 U.S. 270, 279, 76 S.Ct. 349, 100 L.Ed. 309 (1956)].
*Food Fair Stores, Inc. v. NLRB*, 491 F.2d 388, 395 (3d Cir. 1974).

21. The brochure does describe "Speak Out" as a "supplement," and as "one more channel." However, the context suggests that "Speak

Out" was *conceived of* as a "supplement" to existing "channels" of communication, and not as an additional mode of dispute resolution. Thus the General Manager, in his introductory remarks in the brochure, stated his confidence that " 'Speak Out' will be a valuable addition to our employee communications." See pp. 84a–85a.

The Administrative Law Judge's assumption that grievances *were* adjusted would then constitute an assumption that "Speak Out" operated beyond its contemplated scope.

pany did not originally argue "waiver" under Section 3A before the Administrative Law Judge; its principal position[22] was that the system had not been used for the adjustment of grievances within the meaning of the Act.

In any case, we have no occasion to disturb the Administrative Law Judge's finding that the employer did not implement the "Speak Out" program with any actual intent to undermine the grievance procedure, or any other aspect of protected union activity.

■ The Company endeavored to show that not only was there no *intent* to avoid its duty to deal with the Union, there was no such result. We do not question the figures purporting to demonstrate that grievance activity did not decline after "Speak Out" began. (Appendix, pp. 859–61a). However, this demonstration alone is of very little probative value in assessing the materiality of the differences between the pre-existing contractual procedure and "Speak Out." Many other factors might affect the filing of grievances, and the record does not indicate whether any changes took place in the type of grievance filed or the Union's rate of success. To the extent that the grievance data is put forward as an argument that "Speak Out," though perhaps not justified by the Union's waiver in Section 3A of the collective bargaining agreement, should be permitted to continue because it has done no harm to the Union, the argument must be rejected. When Congress, acting within constitutional limits, determines that possible adverse consequences justify the prohibition of certain conduct, a finding that such consequences have occurred or are likely to occur in a particular situation is not necessary to a conclusion that the statutory prohibition has been violated.

This general principle applies with particular force in the present case, since the Congressional enactment is aimed at a specific type of situation and is based on articulated concerns. That § 9(a) represents a delicate and hotly contested balance between competing policy interests is amply demonstrated by the legislative history. On the one hand, Congress wished to preserve for the employee and the employer some flexibility in dealing with individual problems where the intervention of the union might be unnecessary or counterproductive. On the other hand, Congress recognized that the employer could abuse this flexibility by 1) discriminating between employees on the basis of their support or non-support of the union, 2) taking inconsistent positions with respect to similar claims pressed by different employees, thereby obscuring rights under the collective bargaining agreement, and 3) attempting to create the impression among employees that a "better deal" could be had by not resorting to the union's representation or mechanisms.[23] There is nothing in the

**22.** See n. 4, *supra.*

**23.** The legislative history of the 1947 amendment to § 9(a), portions of which are set out in the Brief for Petitioner at pp. 33–35, reflects these concerns and indicates that the resulting two-proviso structure of § 9(a) represents a compromise.

The House version of the amendment to § 9(a) confirmed the right of individual employees to present grievances *and* have them adjusted without the intervention of the Union, but did not contain the second proviso guaranteeing the Union the right to be present at the adjustment of grievances. Congressman Lanham objected:

To grant individual employees or minority groups of employees the right to present and settle grievances . . . without permitting the representative of the majority of the employees to participate in the conference and join in any adjustment is to undermine the very foundations of the act. To create rivalry, dissension, suspicion and friction among employees, to permit employers to play off one group of employees against another, to confuse the employees would completely undermine the collective-bargaining representative. . . .

93 *Cong.Rec.* 3702 (1947).

Senator Murray felt that § 9(a), at least without the second proviso,

makes available to employers a means of undermining the status of the duly chosen bargaining representative by dealing directly with individual employees in the settlement of their grievances and by giving favored treatment to non-union employees.

record to demonstrate that "Speak Out" *could* not be subject to such abuses.

The Administrative Law Judge in his opinion, and the Board and employer in this court, have expressed the belief that programs like "Speak Out" constitute an innovation beneficial to the Union and employees as well as the employer in promoting efficiency, harmony and understanding.[24] Presumably the suggestion is that if we agree, we should refrain from finding that the employer has violated the Act. We must reject this appeal as directed to the wrong forum. Congress has spoken specifically and after due deliberation; neither the Board nor this court has any authority to engraft onto the statutory provision an exception or exemption based on a re-evaluation of policy factors.[25]

Furthermore, we do not view today's decision as foreclosing the implementation of programs having the virtues claimed for "Speak Out."[26] Aside from the possibility of Congressional reconsideration of § 9(a), there are at least two options available. First, the parties could negotiate a new "waiver" section of the collective bargaining agreement which, unlike Section 3A, would be broad enough in scope to cover the "Speak Out" program as currently constituted. If the program does indeed offer advantages to all concerned, the negotiation task should not be impossible, at least if appropriate safeguards can be supplied. Furthermore, if, as suggested earlier, the Company originally conceived of "Speak Out" as dealing only with non-grievance ("informational") matters, it should be feasible to achieve this more limited purpose by preliminarily screening out those "Speak Out" submissions considered to raise grievances, within the meaning of the Act. There could then be no problem under § 9(a).

## V.

The preceding sections have treated the petition for review under the assumption that some of the matters adjusted through "Speak Out" were "grievances," within the meaning of the Act. While counsel for the Board all but conceded at oral argument that this was in fact the case, we agree with petitioner[27] that since the Board made no findings on this point, the proper course is to remand to the Board for that determination.

For the foregoing reasons, the petition for review is granted, the order of the National Labor Relations Board dismissing the complaint is vacated, and the case is remanded to the Board for further proceedings consistent with this opinion.

93 *Cong.Rec.* 6663 (1947).
The Senate added the second proviso, and the Senate version prevailed in conference.

**24.** At oral argument, counsel for the employer suggested that some such flexibility is not only beneficial but necessary, because strict compliance with § 9(a) is simply unworkable in a large industrial plant.

**25.** In *Bethlehem Steel, supra* n. 3, the Board was faced with similar policy arguments for the proposition that an employer may *insist* on a waiver of § 9(a) rights as a condition to a collective bargaining agreement. Rejecting these arguments, the Board said

However, apart from the fact that it is questionable whether the dire results predicted by the [employer] necessarily follow from the recognition of the Union's right to attend grievance adjustments by foremen, it is clear that the explicit language of the Act is the best evidence of what Congress believed would effectuate its purposes. Section 9(a) secures to the bargaining representative the right to attend the adjustment of grievances without qualification and it is not within our province to restrict it. Moreover . . . legislative history and the entire statutory bargaining scheme disclose that the second proviso to Section 9(a) was inserted at least in recognition of the bargaining representative's interest in administering its contract. 89 NLRB at 346–47 (footnotes omitted).

**26.** On the contrary, it might well be that an expansive reading of Section 3A by this court would operate to discourage unions from executing *any* such waiver provision, for fear that it would be read to authorize forms of employer action not contemplated. The result would then be to impede such "innovation" as may be desirable.

**27.** Brief for Petitioner at p. 31, n. 26.