708 F.Supp. 659 (1989)
SOUTH EASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, et al.
Civ. A. No. 89-1604.
United States District Court, E.D. Pennsylvania, Civil Division.
March 8, 1989.
Richard S. Meyer, Joel L. Frank, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for SEPTA.
Michael Brodie, Sacks, Basch Brodie and Sacks, Philadelphia, Pa., for Transport Workers Union of Philadelphia.
Clinton J. Miller, III, Asst. Gen. Counsel, United Transp. Union, Cleveland, Ohio, for United Transp. Union.
Mitchell Kraus, Gen. Counsel, Transp. Communications Int'l Union, Rockville, Md., for Broth. of Ry. Airline Clerks, Freight Handlers, Exp. & Station Employees.
*660 Stephen Richman, Markowitz & Richman, Philadelphia, Pa., Samuel Issacharoff, Washington, D.C., for all unions.
Harold A. Ross, Ross and Kraushaar Co., LPA, Cleveland, Ohio, Cornelius O'Brien, Jr., Cornelius O'Brien, Jr., P.C., Philadelphia, Pa., for Broth. of Locomotive Engineers, Div. 71 Broth'd of Ry.

MEMORANDUM AND ORDER
VAN ANTWERPEN, District Judge.
Plaintiff South Eastern Pennsylvania Transportation Authority ("SEPTA") is before the Court seeking an injunction preventing defendants from honoring secondary picket lines. On March 3, 1989, the Honorable J.E. Dubois, acting as Emergency Judge, issued a temporary restraining order granting the plaintiff relief. In addition, as agreed to by the parties, the order continued in effect until this Court could render a decision on plaintiff's request for a preliminary injunction. From the evidentiary hearings held on March 7 and 8, 1989, we set forth the following facts:
At midnight, March 4, 1989, the International Association of Machinists and Aerospace Workers Union ("IAMAW") began a strike against Eastern Airlines. The parties have exhausted proceedings under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq. (1982), and the dispute may be bitter and protracted. Counsel for the IAMAW Union was present in court and did not dispute that the IAMAW Union feels it has the right to conduct secondary picketing at various locations, including SEPTA facilities. For the purposes of this hearing, SEPTA does not dispute that IAM has the right to engage in this picketing.
Shortly after the Eastern strike began, SEPTA officials received a telegram from William W. Winpisinger, President of IAMAW, sent to the National Railway Labor Conference. It states that IAMAW is "contemplating secondary boycott action wherever possible" and that "in the railroad industry we are presently contemplating establishing secondary picketing on Monday, March 6, 1989, as early in the morning as possible at selected locations on several rail carriers including ... SEPTA." In addition, the telegram requested that other unions refuse to cross the secondary picket lines. IAMAW does not dispute the substance of the telegram, and although it agrees that strikes are fluid, IAMAW concedes that it is likely that there will be secondary picketing. SEPTA comes before the Court in an effort to prevent its union employees from honoring any IAMAW secondary picket lines.
SEPTA is divided into four divisions: 1) the Regional Rail Division which, since January 1, 1983, took over the commuter lines formerly operated by the Reading Railroad, Conrail, and the Pennsylvania Railroads; 2) the City Transit Division which includes buses, trollies, subways, and elevated lines; 3) the Red Arrow Division which runs Suburban Delaware County and other lines; and 4) the Frontier Division which runs the Montgomery County suburban routes. Although it was once thought that all divisions were subject to the anti-secondary picketing provisions of Act 195, 43 P.S. §§ 1101.101 et seq. (Purdon Supp.1988), it is clear that this act does not apply to the SEPTA Regional Rail Division. It is the Regional Rail Division which the IAMAW intends to secondarily picket and which is the subject of this proceeding.
The defendant unions are all parties to collective bargaining agreements with SEPTA. With the exception of the International Brotherhood of Electrical Workers' agreement, each agreement contains a clause which reads substantially as follows:
NO STRIKE
With respect to a strike by the Union, the provisions of the Railway Labor Act Apply.
The agreement between SEPTA and the International Brotherhood of Electrical Workers contains the following clause:
NO STRIKE
For the duration of the Agreement, the Union, its officers, agents, representatives, and members shall not in any way, directly or indirectly authorize, cause, assist, encourage, participate in, ratify or *661 condone any strike, sit-down, sit-in, slow-down, sympathy strike, cessation or stoppage of work, boycott, picketing, or other interference with or interruption of work at any of SEPTA's operations or the operations of any customer of SEPTA.
The Union representatives shall use every reasonable effort to terminate the strike, sit-down, sit-in, slow-down, sympathy strike, cessation or stoppage of work, boycott picketing, or other interference with or interruption of the operation of SEPTA or any customer of SEPTA.
Except for the electrical workers' agreement, each agreement has attached to it a "side letter" agreement which purports to be signed by both SEPTA and the particular union in question. All the side letter agreements contain substantially similar language which refers to the no strike section of the main agreement and prohibits each union from engaging in "any sympathy strike ... in support of any job action or picketing by any SEPTA non-commuter rail employees." Policy statements of some of the defendant unions qualify this side letter clause. Although it agrees that "SEPTA's non-commuter rail employees" are not members of railroad labor organizations, the Brotherhood of Railroad Signalmen indicates that it will support strikes of railroad labor organizations. The United Transportation Union policy states that the union will support its members in not entering the affected territory if a strike of a nationally recognized labor organization is in effect and there is a real or potential danger to members or their families. Similarly, the Brotherhood of Locomotive Engineers policy states that it will support its members who, because of fear of hazard or injuries to themselves, their families, or their property, decline to cross picket lines.
The collective bargaining agreements in question were all negotiated in 1983 and have since been renewed without any written change in either the basic clauses pertaining to strikes or the side agreements. At the hearings the defendant unions did not dispute the validity of the collective bargaining agreements, but some witnesses did question the validity of the side agreements. The ultimate decision in this regard is one for arbitration. However, we have no difficulty in finding for the purposes of this hearing that SEPTA has clearly met its burden of proving that these side agreements were all properly executed by authorized representatives of the defendant unions and were contemplated as valid addendums to the main collective bargaining agreements. Since the main agreement of the International Brotherhood of Electrical Workers has a broad no-strike clause in its main collective bargaining agreement, there is no question that they have contractually agreed not to engage in any sympathy strike at any of SEPTA's operations. We must, however, determine the meaning and scope of the other side agreements.
We are guided by the recent opinion of the Third Circuit Court of Appeals in International Brotherhood of Electrical Workers Local 803, AFL-CIO v. National Labor Relations Board, 826 F.2d 1283 (3d Cir.1987), where the court reviewed a general prohibition against strikes and an arbitration clause. The court noted that although the case involved a petition for review from the National Labor Relations Board, the district court owed no particular deference to the board on matters of contract interpretation. The court then stated that
[t]he waiver of the employees' statutory right to engage in sympathy strikes must be "clear and unmistakable." Metropolitan Edison Co. v. NLRB, 663 F.2d 478, 482 (3d Cir.1981), aff'd, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983); see also United Steelworkers v. NLRB, 536 F.2d 550, 555 (3d Cir.1976 ("a waiver of a statutory right must be clearly and unmistakably established, ... and express language will not be read expansively"). "The extent of the waiver ... `"turns upon the proper interpretation of the particular contract ... [which] must be read as a whole and in light of the law relating to it when made."'" Delaware Coca-Cola [Bottling Co., Inc. v. General Teamster Local Union 326], 624 F.2d [1182] at 1184 [ (3d Cir.1980) ] (quoting Food Fair Stores, Inc. v. NLRB, 491 *662 F.2d 388, 395 (3d Cir.1974) (quoting Mastro Plastics [Corp. v. NLRB], 350 U.S. [270] at 279, 76 S.Ct. [349] at 356 [100 L.Ed. 309 (1956) ]. Thus, any analysis of the waiver issue must begin with an identification of the no-strike obligation in the parties' contract and a determination of its scope. Id. at 1287.
The court went on to state that "in the field of labor relations it is necessary to go beyond mere interpretation of contractual language," id. at 1294, and that "the words parties use in drafting contracts are only evidence of their intent; the words are not themselves the parties' intent." Id. at 1296.
With such guidance, we find that SEPTA has presented us with testimony from which it could clearly be determined at arbitration that the language in the side letter agreements was intended to prohibit the defendant unions from honoring with a sympathy strike secondary picketing by any unions and not just strikes by "SEPTA non-commuter rail employees." SEPTA's chief witness testified that the parties intended this broader prohibition, and that because of careless drafting, the language of the side letter did not represent the true intent of the parties. Moreover, it clearly flies in the face of common sense to conclude that SEPTA would choose to limit sympathy strikes only to situations involving its own non-commuter rail employees. The unions would then be free to engage in a sympathy strike anytime there was secondary picketing by other unions, and this could result in more sympathy strikes than those occasioned by SEPTA non-commuter rail employees. Especially given that there have been no such strikes to date, this construction of the agreement would make little sense.
We are aware that four defendant union witnesses testified that they did not agree to the terms of the side agreements and that the main collective bargaining agreements have clauses which expressly state that they represent the complete agreement of the parties. We find, however, that SEPTA has clearly presented sufficient testimony for us to conclude that these issues should properly be arbitrated under the RLA and that SEPTA has properly requested such arbitration. We are also aware of the prohibitions of the Norris LaGuardia Act, 29 U.S.C. § 101 et seq. (1982) and the policy against enjoining strikes pending arbitration under other labor acts. See Buffalo Forge Co. v. United Steelworkers of America, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In the instant matter, however, we are dealing with unions which are all subject to the RLA. In Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), reh. den., 353 U.S. 948, 77 S.Ct. 823, 1 L.Ed.2d 857 the Supreme Court held that under the RLA federal district courts may enjoin strikes if they involve "minor" disputes. Minor disputes contemplate arbitration under a labor agreement while major disputes involve "disagreements in the bargaining process for a new contract." Id. at 33, 77 S.Ct. at 637. The Court held that the specific provisions of the RLA take precedence over the more general provisions of the Norris LaGuardia Act. Given the admitted existence of valid labor contracts, we find that the dispute over the meaning of the no strike clauses is a minor dispute under the RLA.
We acknowledge that more recently in Burlington Northern Railroad Company v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), the Supreme Court held that the Norris LaGuardia Act does prevent a court from enjoining secondary picketing under the RLA in a major dispute. However, in the instant matter, we are not dealing with a major dispute and we are not enjoining secondary picketing.
We take particular guidance from the decision of then Judge (now Justice) Kennedy in Trans International Airlines, Inc. v. International Brotherhood of Teamsters, 650 F.2d 949 (9th Cir.1980) where the court held that a district court had the power under the RLA to enjoin a sympathy strike pending resolution of a "minor" dispute over the meaning of a no strike clause. Based on the hearing testimony and our *663 common-sense analysis state above, it is clear that for the purposes of this hearing, a sympathy strike violates the no-strike clauses of the labor agreements. We also believe that a sympathy strike would violate the policy of the RLA.
Having resolved this issue, we find that SEPTA has satisfied the other criteria for a preliminary injunction: 1) that SEPTA would suffer irreparable harm in the loss of both long and short term ridership and revenues; 2) that the balance of injury between SEPTA and the unions clearly favors SEPTA because other than their desire to show solidarity with brother unions, defendants have no real interest at stake; 3) that there is a probability that plaintiff will succeed on the merits; and 4) that the public interest is served by granting this injunction. It takes little imagination to project the harm and danger which would immediately flow from the cessation of 90,000 passenger rail trips each day. This is particularly so at this time of year when major highways in Philadelphia are under construction. Thus, we will grant SEPTA's motion for a preliminary injunction.
An appropriate order follows.

PRELIMINARY INJUNCTION
AND NOW, this 8th day of March, 1989, upon consideration of the Motion for Preliminary Injunction and after hearing testimony in open court and it appearing that defendants will engage in a sympathy strike or work stoppage or a refusal to cross picket lines of Eastern Airline Machinists or other acting in concert with them in probable violation of their respective collective bargaining agreements with plaintiff and thus the Railway Labor Act, that plaintiff and defendants are statutorily bound to follow certain arbitration procedures with regard to defendants' claims, and that plaintiff is ready, willing and able to comply with such provisions; that injunctive relief is necessary to preserve unimpaired the arbitration procedures required by the Railway Labor Act; and it further appearing that unless enjoined and restrained defendants' sympathy strike or work stoppage or refusal to cross picket lines of Eastern Airline Machinists or others acting in concert with them will cause substantial, immediate and irreparable harm to plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") as well as to the general public, the amount of which cannot be definitely ascertained, in that:
(a) Plaintiff will be unable to operate its commuter rail service to the serious detriment of both plaintiff and the public;
(b) There will be an overwhelming disruption of service to the traveling public in that the shutdown of commuter rail lines will paralyze the entire City of Philadelphia and metropolitan area. In short, although the City of Philadelphia is dependent upon SEPTA's commuter rail division for some 90,000 passenger journeys per week day, commuter rail transportation service will be interrupted by defendants' refusal to cross picket lines established by International Association of Machinists employed by Eastern Airlines;
(c) There will be an immediate and continuing loss of SEPTA's commuter rail division patronage and ridership;
(d) There will be a considerable, permanent loss of patronage as a result of cessation of commuter rail service, however temporary the cessation period;
(e) The functioning of said transit system as an effective instrument of mass transportation, the sole reason for its acquisition by SEPTA, will be seriously and permanently impaired;
(f) Hazardous conditions in components of SEPTA's rail service system will develop and will go undetected and uncorrected to the peril of its passengers, its employees and the general public;
(g) Plaintiff will be unable to provide for the general maintenance of its equipment and rolling stock required to prevent damage to said equipment and rolling stock;
(h) The absence of commuter rail service will greatly increase the numbers of persons utilizing automobiles, causing congestion and standstills on the already burdened traffic arteries of the region, many of which are undergoing extensive repairs, *664 such as the Schuylkill Expressway, increase driving hazards and cause high levels of air pollution; and further, that the plaintiff and the public will suffer the aforementioned immediate and substantial irreparable harm if a restraining order does not issue forthwith.
IT IS HEREBY:
ORDERED, ADJUDGED AND DECREED until further hearing and further Order of this Court that defendants, their respective members and all others conspiring, acting in concert, or otherwise participating with them, or acting in their aid or behalf, are enjoined and restrained from:
1. (a) violating the Railway Labor Act by engaging in a sympathy strike or refusing to cross picket lines established by International Association of Machinists employed by Eastern Airlines or others acting in concert therewith prior to a declaration or adjudication of their right to do so via the statutorily mandated minor dispute resolution procedures; violating the Railway Labor Act by engaging in a strike over a minor dispute; breaching their collective bargaining agreements with plaintiff by refusing to cross picket lines established by International Association of Machinists employed by Eastern Airlines or persons acting in concert therewith, engaging in any strike, including sympathy strikes, failing to report for work, engaging in work stoppages or slowdowns, abstaining in whole or in part from the whole, faithful and proper performance of their duties of employment with plaintiff, SEPTA, picketing, or otherwise individually or in concert interfering with plaintiff SEPTA's normal operations and/or
(b) encouraging or inducing others to engage in any of the aforesaid activities, and
(c) refusing to perform any procedure which they or their individual members are directed to follow in order to maintain continuing service on the SEPTA commuter rail division.
2. That true but uncertified copies of the Complaint of of this Order and Motion may be served upon each of the defendants.
3. That plaintiff has leave to serve additional true but uncertified copies of the Complaint and of this Order and Motion upon any of the defendants and upon any of the persons acting in concert with them or otherwise participating with them or acting in their aid or behalf.
4. That plaintiff's attorneys or any agents designated by plaintiff may serve true but uncertified copies of the Complaint and of this Order and Motion upon any of the defendants and upon any persons acting in concert with them or otherwise participating with them or acting in their aid or behalf.
5. That defendant and plaintiff proceed to arbitration under their respective contracts and the Railway Labor Act minor dispute resolution procedures to resolve their dispute concerning defendant unions' claimed right to honor the International Association of Machinists employed by Eastern Airlines picket lines.
6. That the United States Marshal enforce this Order.
7. That any violators of this Order be brought immediately before this Court.
8. A bond in the amount of $5,000.00 shall be entered by Plaintiff.