883 F.2d 69
 131 L.R.R.M. (BNA) 3264
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Nathan SCHERR; Harold Perlow, Kenneth Hesson, Harold Cohen,
Victor Cohen, Robert Footlick, Robert Pickner, Stuart
Weitzman, Albert Weitzman, Ronald Weitzman, Kenneth S.
Cooper, d/b/a Blast Soccer Associates, d/b/a Baltimore
Blast, Respondents.
 No. 88-2655.
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1989.
Decided Aug. 9, 1989.
 
 Adin Carl Goldberg (Spengler, Carlson, Gubar, Brodsky & Frischling on brief) for respondents.
 Robert N. Herman (Rosemary M. Collyer, General Counsel, Robert E. Allen, Associate General Counsel; Aileen A. Armstrong, Deputy Associate General Counsel, William R. Stewart, Deputy Assistant General Counsel, National Labor Relations Board on brief) for petitioner.
 Before HARRISON L. WINTER, PHILLIPS, and MURNAGHAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 In 1985, the Baltimore Blast soccer team ("Team")[1] notified one of its players, Resad Kunovac, that it was terminating his contract. The Major Indoor Soccer League Players Association ("Union"), which served as exclusive bargaining representative for all Team members, filed a grievance against the Team on behalf of itself and Kunovac. The Team subsequently entered negotiations with Kunovac, and, without the Union's participation or presence, reached an agreement on February 13, 1987, that purported to settle the grievance.
 
 
 2
 In response to an unfair labor practices charge filed by the Union, an administrative law judge ("ALJ") and the National Labor Relations Board ("NLRB" or "Board") concluded that the Team had violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(1) and (5), by unilaterally adjusting Kunovac's grievance without honoring the Union's right under 29 U.S.C. Sec. 159(a) to be present at the adjustment. The Board issued an order forbidding the Team from adjusting contract grievances without affording the Union the opportunity to be present at the adjustment, and providing that the February 13, 1987 agreement between Kunovac and the Team be set aside if Kunovac so requested. The NLRB has petitioned for enforcement of its order.
 
 I.
 
 3
 The Team is a party to a collective bargaining agreement between the Union and the Major Indoor Soccer League ("MISL"). As is common in professional sports, the collective bargaining agreement allowed the Team to reach individual agreements with players on certain issues, such as pay, bonuses, and various allowances. Article XIX of the collective bargaining agreement governed the individual agreements. Section 1 of Article XIX authorized the Team "to enter into, negotiate and execute individual employment agreements." Section 2 waived the Union's right to participate in "individual negotiating sessions" between players and the Team. However, Article XIX allowed the Union to "challenge the validity of any individual contract through expedited arbitration within ten (10) days of its receipt of the individual contract."
 
 
 4
 Pursuant to Article XIX, the Team in 1983 entered an individual player's agreement with Kunovac. The contract provided that the Team could terminate the agreement at any time upon written notice if the Team management believed Kunovac had failed "to exhibit sufficient skill or competitive ability to qualify for or continue as a member."
 
 
 5
 The Team notified Kunovac in July 1985 that it planned to terminate the agreement and drop him as a player. The Union filed a grievance on behalf of itself and Kunovac, challenging not the termination of Kunovac's contract per se, but rather, the Team's refusal to pay Kunovac a guaranteed salary to which he claimed he was entitled under the contract.
 
 
 6
 A series of negotiations began shortly thereafter in an attempt to settle the grievance. On December 5, 1985, Team attorney Rachel Zelkind met with Branko Perovanovic, Kunovac's agent, and with Peter McGee, a Union representative. Although the parties reached no settlement that day, McGee indicated to Perovanovic and Zelkind that settlement talks should continue and that he should be kept apprised of the progress.
 
 
 7
 In mid-December, Zelkind again met with Perovanovic, but this time without the presence of McGee or any other Union representative. Zelkind later called McGee to notify him that the meeting had taken place. McGee neither protested the meeting nor expressed a desire to attend future meetings between the Team and Kunovac's agent.
 
 
 8
 Additional meetings occurred between Perovanovic and Kenneth Cooper, the Team's executive vice president and head coach. They tentatively agreed on a settlement figure of $30,000. When Union officials learned of the pending settlement, they wrote Cooper to inform him that the Union had filed the grievance and that Kunovac's agent could not settle it on the Union's behalf.
 
 
 9
 On February 13, 1987, Kunovac and the Team entered an agreement that purported to settle the grievance. The agreement called for the Team to pay Kunovac $30,000 in exchange for his agreeing to termination of his players's contract and relinquishment of all claims against the Team. As part of the settlement, Kunovac also agreed to terminate grievance proceedings against the Team and to instruct the Union to do the same. The final settlement occurred at a time of which the Union was not informed and at a place to which the Union was not invited.
 
 II.
 
 10
 We must decide whether the Union, either through its collective bargaining agreement or through words or actions of its agent, waived its statutory right to attend the adjustment, i.e., the final settlement, of Kunovac's grievance on February 13, 1987. The statutory right arises from Section 9(a) of the National Labor Relations Act, which provides in pertinent part:
 
 
 11
 That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect. Provided further, That the bargaining representative has been given opportunity to be present at such adjustment.
 
 
 12
 29 U.S.C. Sec. 159(a) (emphasis in original).
 
 
 13
 The parties here have assumed that the Union may waive its statutory right to be present at grievance adjustments. We also will assume, without deciding, that such right is subject to waiver.
 
 A.
 
 14
 The Team first argues that Article XIX of the collective bargaining agreement waived the Union's statutory right to be present at the adjustment of Kunovac's grievance. At the outset, a question arises as to whether the agreement purporting to settle Kunovac's grievance even falls within the scope of Article XIX, which allows the Team "to enter into, negotiate and execute individual employment agreements." One might plausibly argue that "individual employment agreements" encompass only those contracts governing various terms and conditions of a player's association with the Team, rather than those contracts which terminate the employment relationship. Were that the case, the waivers contained in Article XIX might be wholly irrelevant to the agreement reached on February 13, 1987.
 
 
 15
 Nonetheless, we need not decide the issue because even if Article XIX covers the type of agreement involved here, the Union at most waived its right to attend individual negotiating sessions preceding the adjustment of the grievance, rather than the right to be present at the adjustment itself. Article XIX clearly distinguishes between negotiations leading up to an agreement, on the one hand, and the entry of the parties into that agreement, on the other. For example, Section 1 of Article XIX authorizes the Team "to enter into, negotiate and execute individual employment agreements," thus illustrating that the negotiations and the reaching of the agreement are distinct steps in the contractual process. Section 2 of the Article merely authorizes the Team "to engage in individual negotiating sessions with Players without the participation" of the Union. Section 2 says nothing about the Union's right to be present when the parties finally enter into an agreement following those negotiations. Such silence compels us to conclude that the Union, notwithstanding Section 2, has retained its statutory right to be present at the grievance adjustment on February 13, 1987, when Kunovac entered the agreement purporting to sever his ties to the Team.
 
 
 16
 Our holding flows from the well-established principle that waivers of statutory rights "must be clear and unmistakable." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708 (1983). Accord Id. at 708 n. 12 (citing cases); United Steelworkers of America v. NLRB, 536 F.2d 550, 555 (3d Cir.1976) ("waiver of a statutory right must be clearly and mistakably established, ... and express language will not be read expansively."). Because the language of Section 2, Article XIX expressly covers only negotiations, rather than the final entry into an agreement after those negotiations, we will not read the waiver so broadly as to cover the adjustment of Kunovac's grievance on February 13, 1987.
 
 B.
 
 17
 The Team pursues a second line of attack against the NLRB's decision by arguing that Peter McGee, a Union representative, orally and through his actions waived the Union's statutory right of presence at the adjustment. We agree with the ALJ, however, that any waiver by McGee extended no further than the collective bargaining agreement's waiver of the Union's right to attend individual negotiating sessions preceding the grievance adjustment. McGee's waiver did not encompass the Union's statutory right to attend the final adjustment of Kunovac's grievance on February 13, 1987.
 
 
 18
 In arguing for waiver, the Team focuses primarily on McGee's statement to a Team representative on December 5, 1987, that the Team and Kunovac's agent should continue settlement talks and should keep the Union apprised of progress in the discussions. The Team also emphasizes that McGee failed to protest when notified later that same month that a Team representative had met with Kunovac's agent without the Union's participation.
 
 
 19
 As we have emphasized, waivers of statutory rights, such as those embodied in Section 9(a) of the National Labor Relations Act, must be clear and unambiguous. Although McGee clearly waived the Union's rights to attend individual negotiating sessions between Kunovac and the Union, he said nothing about the Union's right to be present when the grievance was finally adjusted. We refuse to read McGee's silence about the adjustment as a complete waiver of the Union's Section 9(a) rights.
 
 C.
 
 20
 Basic notions of fairness also make us hesitant to find a waiver, under the facts presented here, of the Union's statutory right of presence at the grievance adjustment. It seems particularly unfair to exclude the Union from an adjustment which, in practical effect, could settle the very grievance the Union filed on its own behalf. Although the Team now argues that the settlement with Kunovac did not affect the Union's own grievance, the facts suggest otherwise. As part of the settlement, Kunovac had to agree to instruct the Union to dismiss the grievance it had filed. The Team has attempted, by excluding the Union, to adjust the Union's grievance without giving it a chance to be heard. The Union might well have interests separate and distinct from those of Kunovac.
 
 
 21
 Moreover, the Union's presence at the grievance adjustment could serve a valuable function, even though it had surrendered its opportunity to attend and make its views known at the individual negotiating sessions. By attending the final settlement of the grievance, Union representatives could advise Kunovac against accepting an unfavorable settlement offer and could object to, though not veto, a settlement that would prejudice the interests of the Union and its members. The Team argues, however, that the Union had no need to attend Kunovac's grievance adjustment because Article XIX of the collective bargaining agreement allowed the Union to challenge the February 13, 1987 agreement through expedited arbitration after the adjustment. We disagree that the arbitration option provided an adequate substitute for the Union's statutory right to be present at the adjustment. Even if expedited arbitration was available to the Union to challenge the agreement between Kunovac and the Team, a matter on which we express no opinion, the opportunity to voice objections to the agreement before it became final offered important advantages over post facto attacks on the contract. By persuading Kunovac to reject the proposed agreement before it was finalized, the Union could perhaps have spared itself and the Team time-consuming and possibly contentious arbitration proceedings.
 
 III.
 
 22
 In conclusion, the Union did not waive its statutory right to be present at the adjustment of Kunovac's grievance either through its collective bargaining agreement or by the words and actions of its agent. The NLRB properly found that the Team violated the National Labor Relations Act by not allowing Union representatives to be present at the adjustment. The NLRB's order against the Team is hereby
 
 
 23
 ENFORCED.
 
 HARRISON L. WINTER, Circuit Judge, dissenting:
 
 24
 I dissent. I would deny enforcement of the order.
 
 
 25
 I do not read Article XIX of the collective bargaining agreement to constitute a waiver by the Union of the right to participate in negotiations regarding settlement of a grievance filed in response to an alleged breach of a player's individual contract. Rather, it had a contractual right to participate fully in the resolution of the grievance as set forth in Article III of the collective bargaining agreement. In addition, the Union had a statutory right to be present at the adjustment of a grievance. 29 U.S.C. Sec. 159(a). I think, however, that these rights were waived.
 
 
 26
 The administrative law judge found that the Union waived its right to be present at settlement negotiations between the Team and the player. This finding has substantial evidentiary support. He concluded, however, that the waiver extended only to negotiations and not to actual adjustment of the dispute.* I find no substantial evidence in the record to support this fine distinction. Indeed the distinction is lacking in common sense. Anyone who has ever participated in settlement negotiations knows that they may give birth to a settlement agreement at any time. If one says "I do not wish to be present for further negotiations, but continue without me", it seems to me that it necessarily follows that the party is expressing disinterest in the fruits of the negotiations unless that party has expressly stated otherwise. There was no such reservation in this case. I would conclude that the record permits only a finding that Union participation in negotiation and settlement of the grievance was waived.
 
 
 
 [1]
 For simplicity's sake we refer to the respondents collectively as the "Team". The full list of respondents consists of Nathan Scherr, Howard Perlow, Kenneth Hesson, Harold Cohen, Victor Cohen, Robert Footlick, Robert Pickner, Stuart Weitzman, Albert Weitzman, Ronald Weitzman, and Kenneth S. Cooper d/b/a Blast Soccer Associates d/b/a Baltimore Blast
 
 
 *
 Contrary to my view, the administrative law judge ruled that Article XIX of the collective bargaining agreement constituted a waiver by the Union of the right to be present at settlement negotiations but not of the right to approve the final settlement agreement. It may well be that this erroneous interpretation of Article XIX influenced this hair-splitting conclusion